**UNITED STATES OF AMERICA**,

      Plaintiff,

         v.

**SANDY HERNANDEZ-MIESES (1)**,

      Defendant.

Crim. No. 16-746(PG)

## OPINION AND ORDER

In November of 2016, Sandy Hernandez-Mieses ("Hernandez" or "Defendant"), Yonattan Jimenez-Diaz ("Jimenez"), and Oniel Lajara-De La Cruz ("Lajara") were charged with various firearm and drug-related counts. Co-defendant Hernandez now moves motion to suppress the evidence against him (Docket No. 63, 81), and the United States' opposes his request (Docket No. 66, 85).[1] After holding an evidentiary hearing and carefully considering the parties' arguments, the court finds that the Defendant's motion to suppress should be **GRANTED IN PART AND DENIED IN PART** for the reasons explained below.

### I. BACKGROUND

According to the criminal complaint (Docket No. 1-1), in the early morning hours of November 1st, 2016, Homeland Security agents, task force and law enforcement officers set out to execute an arrest warrant against Hernandez issued by this court in another criminal case.[2] At 5:45a.m., the officers arrived at Hernandez's residence and noticed activity inside the home. After identifying themselves at the front door, an individual approached the door and locked it from the inside of the house. Special Agent Yuany Fernandez ("Fernandez") and Group Supervisor Ricardo Nazario

---

[1] Co-defendant Jimenez also moved to suppress the evidence (Docket No. 64) and the government opposed his request (Docket No. 69) for lack of standing. The court agreed with the government and summarily denied Jimenez's motion during the suppression hearing held on March 9, 2017. See Docket No. 79.

[2] The arrest warrant in question was issued in Criminal Case No. 16-646(GAG-SCC) and states that co-defendant Hernandez conspired to import into the United States from a place outside thereof, to wit, Venezuela, five (5) or more kilograms of cocaine. See Docket No. 63 at Crim. No. 16-646(GAG-SCC).

("Nazario") broke the window of the front door and opened it by turning the keys in the lock on the inside. Through the broken door window, Fernandez and Nazario observed three men inside the residence, including Hernandez sitting on a wheelchair. The two other men, later identified as co-defendants Jimenez and Lajara, fled through the back door and patio of the residence. The officers eventually caught Jimenez, whose clothes were wet and covered in sand. Jimenez told the officers he was a citizen of the Dominican Republic and had just arrived on a yawl.

At the residence, the agents arrested Hernandez in the dining room area, where they saw in plain view four cellular phones and cash on the dining room table and a pistol on the kitchen counter. The agents proceeded to perform a security sweep of the home with the assistance of Customs and Border Protection canine Honzo, trained to detect concealed humans, narcotics and currency. In the rooms of the second floor of the residence, Honzo alerted the officers to a sports bag containing cocaine, as well as cash in drawers and inside a box in a closet. Upstairs, the agents also found additional cellular phones and a pistol inside a safe box in the closet of the master bedroom.

The agents also found material evidence in two cars. A white 2005 Ford was parked in the garage of the residence. The agents opened the van after noticing the hood felt hot, fresh mud along the bottom, and water dripping from the rear. Therein, the agents found approximately thirty to forty wet bales containing what appeared to be cocaine. With keys found on the dining room table, the agents also opened a 2011 Toyota Sienna parked in the driveway of the residence. Inside, they found a pistol, cash and additional cellular phones. Additionally, they found the photographic identifications of the other two co-defendants that had fled the scene.

After the government filed the complaint against defendants, the latter were indicted on November 30, 2016. See Docket No. 46. Specifically, the government charged Hernandez with the following: (1) conspiracy to import a narcotic controlled substance (cocaine) in violation of 21 U.S.C. §§ 963, 952(a), and 960(a)(1) & (b)(1)(B); (2) aiding and abetting and importation of a narcotic controlled substance (cocaine) in violation of 21 U.S.C. §§ 952 and 960(a)(1) & (b)(1)(B);

(3) conspiracy to possess with intent to distribute five or more kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A)(ii), 846; (4) aiding and abetting and possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(A)(ii) and 18 U.S.C. § 2; (5) aiding and abetting and possession of firearm in furtherance of drug trafficking crimes in violation of 18 U.S.C. §§ 924(c)(1)(A) & 2. See id.

The matter is before the undersigned on Hernandez's request to suppress the evidence found in his home and cars during the execution of the arrest warrant. See Dockets No. 63, 81. Hernandez argues that the search of his residence during and after the execution of his arrest was in violation of the Fourth Amendment because it exceeded the limits of the protective sweep and search incident to arrest exceptions. In particular, Defendant contends that the warrantless search was unreasonable because it involved a canine unit and the officers searched in spaces outside the scope of a protective sweep, such as the second floor of the residence, the garage, bags, drawers, and cars. Concerning the vehicles where the agents found incriminating evidence, Hernandez contends that the law enforcement officers lacked the requisite probable cause to search them. Hernandez also questions whether some of the evidence found was actually in plain view as the officers purport. According to Hernandez, he was handcuffed and in a wheelchair and the agents were in control of the perimeter, and thus, a search warrant was required to allow for the full search of the Defendant's home that the officers performed. In his brief, the Defendant requested the suppression of the following:

a) Glock Handgun found on kitchen top on the first floor;

b) Pistol magazine at entry of the house;

c) 4 kilograms of cocaine found on male child's room at the second floor;

d) Cellphones allegedly found on the bed of a male child's room at the second floor;

e) Money found on male child's room at the second floor;

f) Money and receipts found on master room including some $45,940.00 in cash;

    g) Beretta handgun found on walking closet at the master room;

    h) Around 1,700kgs of cocaine narcotics found at a closed van in the garage of the house;

    i) A brown Glock found in the middle console of Toyota Sienna in the driveway;

    j) Some monies found in the Toyota Sienna; and,

    k) Cellphones found on dining room table.

See Docket No. 81 at page 6.

The United States opposed Hernandez's motion to suppress, see Docket No. 66, 85. The government argued that the circumstances of the arrest justified the search, such as the unexpected presence of additional cohorts in the house who took flight upon the officers' entry to the residence and the firearm and other tools of the drug trade seen in plain view. Accordingly, the government argues that the evidence found is not the fruit of the poisonous tree, but instead falls under the mantle of various exceptions to the Fourth Amendment's warrant requirement, such as the protective sweep doctrine, the plain view doctrine, the automobile exception and the inevitable discovery doctrine.[3]

## II. FACTUAL FINDINGS[4]

The court held a suppression hearing on March 9, 2017. See Docket No. 79. The government called Group Supervisor Ricardo Nazario of Homeland Security to testify.

### Nazario

Nazario has been a special agent of Homeland Security Investigations ("HSI") for sixteen years, the last seven of which he has

---

[3] While the government mainly focuses its discussion on the elements of the protective sweep doctrine, the court notes that the government's memoranda of law makes just a passing reference to the automobile exception and merely mentions, but fails to develop, the inevitable discovery doctrine. The government's scant brief thus left the undersigned and his staff to do the heavy lifting in terms of researching the applicable law. The court must point out that the government's performance in this matter has left much to be desired. The officers of the court that represent the United States would do well to remember that regurgitating boilerplate case law is insufficient to carry the day.

[4] The court's findings are based on the evidence on record and the Transcript of Suppression Hearing (Docket No. 76).

been Group Supervisor for the Caribbean Corridor Strike Force. In essence, Nazario investigates maritime drug smugglings.

## *The Investigation: Beach Break*

At the time relevant herein, Nazario was working on an operation known as "Beach Break," investigating a drug-smuggling organization. As a result, this court issued an arrest warrant against Hernandez, among others, in Criminal Case No. 16-646(GAG). Nazario set out to execute this arrest warrant on November 1, 2016 at Hernandez's residence. Prior to this day, Nazario had conducted surveillance of Hernandez at his residence.

## *The Arrest*

At approximately 5:45a.m., Nazario arrived at Hernandez's residence in a group consisting of about twenty special agents and task force officers in ten cars. In addition, one of the officers was handling a K-9 unit from Customs and Border Protection called Honzo, which was trained to look for concealed humans and narcotics. Prior to the operation, Nazario briefed the law enforcement agents that there was a high probability of finding weapons, narcotics, and currency in the house. See Docket No. 76 at pages 66-67.

Photos from Hernandez residence show a Toyota Sienna could be seen parked at the house's driveway. The garage door was closed and the Toyota Sienna was blocking it. There was also a Mercedes Benz parked on the street in front of the house.

Upon approaching the front of the house, Nazario noticed the lights inside the house were on. To his surprise, he also perceived the movement of several individuals inside the house. At the door, Nazario announced and identified himself as police. Immediately thereafter, he saw the shadow of an individual locking the door. After trying to open the door and being unable to, the officers broke the frosted glass on the door and looked through the holes they made. Nazario saw Hernandez sitting on his wheelchair and two other individuals who immediately took off. They ran to the outside of the back of the house. The two fleeing subjects were indentified as Jimenez and Lajara, the co-defendants in this case.

Nazario then reached for the keys in the door and opened it.[5] He ran in an attempt to catch Jimenez and Lajara but they had already jumped the fence of the back of the house. Nazario thus ordered some agents to find them on the streets of the neighborhood. They caught up with co-defendant Jimenez and arrested him. Hernandez, on the other hand, stayed put sitting by the dining room table when another officer arrested him. It was Nazario's testimony that approximately ten agents entered the house and another ten stayed back securing the perimeter. See Docket No. 76 at page 68. Nazario explained that the officers had control of the perimeter after Hernandez's arrest. Id. at 69.

## Protective Sweep of the House

After the co-defendants fled, Nazario went back to the house and saw a weapon on the kitchen counter in plain view. The weapon was a Glock with a magazine and was visibly covered with sand. It was Nazario's testimony that the weapon was evidence of criminal activity. See Docket No. 76 at page 67. On the dining table, he saw a bag, cash ($721), four cellular phones and jewelry. On the path towards the kitchen from the dining table, there were stairs that led to the second floor of the residence. Past the kitchen, he saw open doors that led to the swimming pool and the garage.

In light of the two subjects on the run and the weapon he saw in plain view, Nazario decided to perform a security sweep of the house for the sake of the safety of his officers and himself. See Docket No. 76 at pages 17-18, 98. Nazario's concern was there could be additional subjects, weapons, narcotics and other tools of the trade in the house. With the assistance of a group of law enforcement agents and Honzo, Nazario began a security sweep of the first level of the residence, including a bathroom and the kitchen area. Afterwards, Nazario and the agents went upstairs to the second floor of the residence. Nazario

_____

[5] For the purposes of this analysis, the court assumes that some seconds elapsed from the moment the door was locked from the inside to the moment the officers could peep through, as well as from the moment the officers stopped peeping and eventually opened the door to make their way inside.

testified he had not seen anyone inside the residence go upstairs nor recalled hearing noises coming therefrom.

The agents first went to a child's bedroom, where Honzo alerted to a bag laying in front of the bed. According to Nazario, the bag was open and contained four kilograms of cocaine. On top of the bed, Nazario saw four cellular phones. Thereafter, the agents moved on to a second child's bedroom and a bathroom, where they found nothing.

Nazario and the agents then searched the master bedroom. In the closet, Honzo alerted the agents to a box. The dog opened the box, and a lot of cash was found therein ($34,000). See Docket No. 76 at pages 19, 23.

After finishing the search on the second floor, the agents returned to the first floor. They went past the open doors that lead to the backyard and swimming pool of the house and turned right towards the garage. They were still looking for people who could potentially be hiding in the house. Although Nazario had not seen any shadows in the garage area or seen anyone flee towards the garage, he suspected people could be hiding there because the door that led to the garage was open and people could be hiding in the back of the cargo van.[6]

## Warrantless Search of the Ford Cargo Van

The agents saw a white Ford cargo van parked in the garage of the residence.[7] Its hood felt hot to the touch, according to Nazario. The van looked dirty as it had mud and wet sand around the tires and the back of the van, and Nazario saw water dripping out of the van's cargo area. Nazario also perceived the smell of salt water and fuel. At this time, Nazario believed he had perceived enough evidence to request a search warrant. See Docket No. 76 at page 88. In light of his experience and observations, Nazario claimed he could reasonably foresee that there could be narcotics inside the van. See Docket No. 76 at pages 91-92. Nazario opened the back doors of the van, which were unlocked, and saw

---

[6] See Docket No. 76 at pages 57, 59, 90-91.
[7] The agents did not see this cargo van from the outside of the house when they arrived to execute the arrest warrant. Because the Toyota Sienna was parked behind the closed garage door, the cargo van could not have been driven out of the garage. See Docket No. 76 at pages 56-57.

approximately forty bales of narcotics (1,700 kilograms) and ropes. Although Honzo was next to Nazario at the time, the dog's alert took place after opening the van's rear doors. <u>See</u> Docket No. 76 at page 87-89. The bales had nine different markings on them, which according to Nazario, are used by drug traffickers to identify who is meant to receive the smuggled drugs.

*Phone Call to AUSA Laborde*

        After finding the drug inside the cargo van, Nazario ordered one of the agents to call Assistant United States Attorney Desiree Laborde. According to Nazario, the call was placed around seven o'clock in the morning.[8] <u>See</u> Docket No. 76 at page 65. After explaining to her what they had found, Laborde told Nazario they did not need a search warrant to continue with a full search of the house. The agents then conducted a full search of the house with her authorization.

*Warrantless Search of the Toyota Sienna Minivan*

        Before performing a full search of the house, between 6:00-6:15a.m.,[9] the agents searched inside the Toyota Sienna that was in the driveway in front of the garage door. The Toyota Sienna was parked in an open space and could be seen from the street. During the course of his surveillance, Nazario had seen Hernandez drive the Toyota Sienna. The minivan had an installed mechanism that allowed the Defendant to drive it despite him being paraplegic. Before opening the Toyota Sienna, the agents could see from the outside that the minivan's tires and carpets had sand on them. They also noticed its hood was hot to the touch. This led Nazario to believe that the minivan was used in furtherance of the smuggling of the narcotics that the agents had found inside the cargo van. Hence, the officers opened the minivan with keys found in the dining room. <u>See</u> Docket No. 76 at page 83. Inside the vehicle's compartments, they found a fully loaded weapon (Glock), a paper

─────────────────────

[8] The record shows that the phone call to AUSA Laborde was placed at 6:07a.m. and lasted seven minutes. <u>See</u> Docket No. 81-2. Therefore, between 5:45a.m. and 6:07a.m. (22 minutes), the law enforcement agents arrived at the scene, arrested Hernandez, performed a protective sweep of both floors of the residence, and finally called AUSA Laborde.
[9] <u>See</u> Docket No. 76 at page 84.

bag full of currency, a GPS, and a wallet with Lajara's ID. The minivan, however, was registered under the name of Hernandez's wife.

## *Warrantless Search of the Mercedes Benz*

The agents also found the keys to a Mercedes Benz parked on the street in front of Hernandez's residence and opened it. This car was registered under Hernandez's name. No items were seized from this car.

## *Warrantless Search of the House*

After speaking with AUSA Laborde, the officers initiated a full search of the house. Nazario divied up the agents into different teams. At the left of the front door, the agents found tennis shoes with sand on them and a pistol magazine inside of the shoes. Nazario claims these items were in plain view. In the kitchen area, the agents found another GPS. The agents also opened a man purse laying on the dining room table, where they found more documents and money. At this point, the agents also seized the bag with the four kilograms of cocaine in the child's room, as well as the four cellular phones on the bed. In the second child's room, the agents seized another cellular phone. Inside the master bedroom, they found a lot of money in the night table and in the drawer of a cabinet. In addition to the box with money that Honzo found inside the master room closet during the protective sweep, the agents also found another weapon therein. Specifically, they found a Beretta and a $100 bill in a safe box that had sand in it.

It was Nazario's testimony that it took him and the officers approximately two hours, or until on or about 10:30 or 11:00a.m., to finish the search. Nazario never sought a search warrant because, first, he was in the middle of a protective sweep and afterwards because the federal prosecutor told him he did not need one. Nazario did not obtain Hernandez's consent for the search.

### III. LEGAL ANALYSIS

The Fourth Amendment to the U.S. Constitution states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated … ." U.S. CONST. amend. IV. "The text of the Amendment thus

expressly imposes two requirements. First, all searches and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." Kentucky v. King, 563 U.S. 452, 459 (2011) (citing Payton v. New York, 445 U.S. 573, 584 (1980)).

"It is a basic principle of Fourth Amendment law … that searches and seizures inside a home without a warrant are presumptively unreasonable." King, 563 U.S. at 459 (internal quotation marks omitted) (citing Brigham City v. Stuart, 547 U.S. 398, 403 (2006). In Weeks v. United States, 232 U.S. 383 (1914), the Supreme Court adopted the federal exclusionary rule for evidence that was unlawfully seized from a home without a warrant in violation of the Fourth Amendment. See Hudson v. Michigan, 547 U.S. 586, 590 (2006). Therefore, exclusion of the evidence obtained by a warrantless search vindicates a citizens' entitlement under the Fourth Amendment to shield their persons, houses, papers, and effects from the government's scrutiny. Id. at 593.

Notwithstanding, "[t]he Fourth Amendment does not forbid any and all warrantless incursions on the person and property of an individual." U.S. v. Gamache, 792 F.3d 194, 198 (1st Cir.2015). "[B]ecause the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." Brigham City, 547 U.S. at 403. "What is reasonable depends upon all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." U.S. v. Montoya de Hernandez, 473 U.S. 531, 537 (1985) (citing New Jersey v. T.L.O., 469 U.S. 325, 337-342 (1985)).

"The government would bear the burden of invoking any exception to the warrant requirement," United States v. Green, 698 F.3d 48, 53 n. 4 (1st Cir. 2012) (citing Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971)). Accordingly, "[t]he government bears the burden of proving the lawfulness of the search," United States v. Gonsalves, No. 15-1194, 2017 WL 2456798, at *5 (1st Cir. June 7, 2017) (citing United States v. Lopez, 380 F.3d 538, 543 (1st Cir. 2004)).

In the case at hand, the law enforcement agents possessed a valid arrest warrant against Hernandez and forcibly entered his house after they announced themselves as the police and were denied entry. In Payton

v. New York, the Supreme Court held that "police armed with a valid arrest warrant may 'enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'" United States v. Werra, 638 F.3d 326, 352 (1st Cir. 2011) (Payton v. New York, 445 U.S. 573, 603 (1980)). There is no question that the facts of this case satisfy Payton's two-prong inquiry as to the officers' entry inside Hernandez's home for the purposes of executing the arrest warrant. See Payton, 445 U.S. at 602-03 ("If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.").

Here, the Defendant is specifically challenging the law enforcement agents' search of his home and vehicles.

## A. Protective Sweep

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." United States v. Winston, 444 F.3d 115, 118 (1st Cir. 2006) (citing Maryland v. Buie, 494 U.S. 325, 331 (1990)). In Buie, the Supreme Court held that "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Buie, 494 U.S. at 337. In support of this holding, the Supreme Court "reasoned that an in-home arrest can pose a greater risk of danger than a typical on-the-street Terry encounter." Werra, 638 F.3d at 350 (citing Buie, 494 U.S. at 332).

> A protective sweep, in contrast, occurs as an adjunct to the serious step of taking a person into custody for the purpose of prosecuting him for a crime. Moreover, unlike an encounter on the street or along a highway, an in-home arrest puts the officer at the disadvantage of being on his adversary's "turf." An ambush in a confined setting of unknown configuration is more to be

> feared than it is in open, more familiar
> surroundings.

Buie, 494 U.S. at 333.

A protective sweep, however, is not a full search of the premises. See id. at 335. "It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id. at 327. Such a sweep "lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335–36.

The United States mainly argues that the present exigent circumstances justified the completion of a protective sweep of the house and the vehicles. "The exigent circumstances triggered by the hot pursuit of fugitives, the Glock weapon found in plain view, and the possibility of additional armed subjects hiding or destroying evidence in the premises justified the security sweep of the entire premises." Docket No. 85 at page 22. The government contends that a protective sweep was thus permissible and the evidence found during its completion was legally obtained. The court agrees.

On the date of Hernandez's arrest, Nazario and the rest of the officers that arrived at Hernandez's residence knew that the Defendant was being arrested for his participation in a drug smuggling conspiracy. They were then surprised to find that the Defendant was not alone at such an early morning hour. Instead, he was in the company of (at least) two additional subjects who quickly fled after the police had to break into the home to execute the arrest warrant. "This observation of the … individuals fleeing could reasonably have further heightened the officers' suspicion that the … men had run in order to avoid police detection." United States v. Gomez-Vega, 519 F. Supp. 2d 241, 259 (D.P.R. 2007). "Our cases have … recognized that nervous, evasive behavior is a pertinent factor in determining reasonable suspicion. … Headlong flight — wherever it occurs — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of

such." <u>Illinois v. Wardlow</u>, 528 U.S. 119, 124 (2000) (internal citations omitted).

In addition, shortly after entering the Defendant's residence, Nazario and the officers observed a weapon and several mobile phones in plain view. The First Circuit has previously noted that firearms and cellular phones are well-known tools of the drug trade. <u>United States v. De La Cruz</u>, 996 F.2d 1307, 1311 (1st Cir. 1993); <u>United States v. Martinez-Molina</u>, 64 F.3d 719, 728 (1st Cir. 1995) (finding cellular phones are tools of the drug trade); <u>United States v. Martinez-Lantigua</u>, 857 F.3d 453, 457 (1st Cir. 2017)("Firearms are a common tool of the drug trade.").

The foregoing observations, namely, the fleeing subjects, the weapon on the kitchen counter and the multiple cellular phones on the dining table, were more than sufficient to raise a "reasonable suspicion" in the mind of an experienced law enforcement agent such as Nazario that a protective sweep was indeed called for. Under those circumstances, the agents could have reasonably believed that they were in danger when executing the warrant for Hernandez's arrest. The court thus finds that a protective sweep was warranted.

Hernandez argues, however, that the protective sweep undertaken in this case transgressed the Fourth Amendment. Firstly, the Defendant complains about the law enforcement agents' use of a canine unit during the course of a protective sweep. According to the Defendant, "the protective sweep doctrine does not permit the use of dogs to search inside a dwelling … ." Docket No. 81 at page 7. In support of this contention, Hernandez cites <u>Florida v. Jardines</u>, 133 S.Ct. 1409 (2013).

In <u>Jardines</u>, police officers brought a drug-sniffing dog onto a homeowner's porch without a warrant. After the dog provided a positive alert, the police obtained a warrant based on this information and searched the home. The Florida Supreme Court rendered the warrant invalid and suppressed the evidence found during the execution of said warrant. The Supreme Court affirmed the state court's decision and held that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." <u>Jardines</u>, 133 S. Ct. at 1417–18. The Supreme Court's

opinion was driven by the fact that the dog sniff occurred in the curtilage of the defendant's home, and thus, the officers engaged in an unlicensed physical intrusion of a constitutionally-protected area.

Pursuant to the foregoing, this court finds <u>Jardines</u> to be inapposite here because the law enforcement agents' physical intrusion into the Defendant's home was not unlicensed when they brought the dog. On the contrary, the police in this case had a right to be where they were when they brought the canine unit into the house to aid them during the protective sweep. See e.g., <u>Peals v. Terre Haute Police Dep't</u>, 535 F.3d 621, 628 (7th Cir. 2008) ("As a general rule, K-9 units trained to protect officers and apprehend suspects may accompany police officers.") (holding presence of canine units in garage did not render protective sweep of garage unreasonable).

Hernandez has the threshold burden of showing a Fourth Amendment violation in support of a motion to suppress. <u>See United States v. Young</u>, 835 F.3d 13, 19 (1st Cir. 2016); <u>see also Rakas v. Illinois</u>, 439 U.S. 128, 132 n.1 (1978) ("The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."). Moreover, "a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." <u>Echevarria v. AstraZeneca Pharm. LP</u>, 856 F.3d 119, 139 (1st Cir. 2017) (<u>citing United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir.1990)). The Defendant failed to point this court's attention to cases holding that the use of a sniffing dog in the completion of a justified protective sweep without a search warrant is unreasonable under the tenets of the Fourth Amendment.[10] The argument was raised in such a conclusory and perfunctory manner that we deem it waived. See <u>Zannino</u>, 895 F.2d at 17 ("[I]issues adverted to in a perfunctory manner,

---

[10] See, e.g., <u>United States v. Esquilin</u>, 208 F.3d 315, 318 (1st Cir. 2000)("On the contrary, the important factor in applying <u>Place</u> is not whether the sniff occurs in a public place like an airport, but whether — as in an officer's 'plain view' observation of contraband — 'the observing person or the sniffing canine are legally present at their vantage when their respective senses are aroused by obviously incriminating evidence.'")(<u>citing United States v. Reed</u>, 141 F.3d 644, 649 (6th Cir.1998))) *abrogated on other grounds by* <u>Missouri v. Seibert</u>, 542 U.S. 600, 124 S. Ct. 2601, 159 L. Ed. 2d 643 (2004).

unaccompanied by some effort at developed argumentation, are deemed waived.").

The Defendant also argues that the search in the second floor of the house and the garage fell outside the scope of a protective sweep because the agents never saw anyone flee towards those areas. See id. at page 10. On the contrary, the government contends that the protective sweep in those areas was justified considering the kitchen counter where the officers saw a firearm in plain view was just steps away from the door that led to the swimming pool and the garage and to the stairs that led to the second floor.

After careful analysis of the facts of this case, the court finds that extending the protective sweep to the garage and the second floor was within the bounds set forth by the Supreme Court in Buie and the First Circuit in United States v. Winston, 444 F.3d 115, 120 (1st Cir. 2006). In Buie, police officers were executing an arrest warrant inside Buie's house and discovered the evidence sought to be suppressed in plain view during a "protective sweep" of the basement after the defendant had emerged therefrom and had been arrested and handcuffed. See Buie, 494 U.S. at 328. The Supreme Court concluded that the Fourth Amendment would permit the protective sweep undertaken there "if the searching officer possessed a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warranted the officer in believing … that the area swept harbored an individual posing a danger to the officer or others." Id. at 327 (citations and quotation marks omitted).

On the other hand, in Winston, several police officers entered the defendant's house to arrest him, and while the defendant was arrested and handcuffed on the second floor of his house, some police officers performed a protective sweep of the basement. The First Circuit found the protective sweep to be objectively reasonable under the circumstances insofar as there was a distinct possibility that a man could be hiding in the basement.

> Obviously, the agents had the right to protect
> themselves not only from [defendant] but from all
> other circumstances reasonably within the scope of
> the dangers they were facing, i.e., an arrest

> involving a member of a drug organization with
> multiple constituents, not all of whom had been
> accounted for, who were likely to be armed, as
> [defendant] was, in a setting which presented an
> opportunity for ambush or similar violent conduct
> against the arresting officers.

Winston, 444 F.3d at 120. "When agents arrest an armed criminal with known cohorts in his home, they put themselves in a dangerous situation and must be able to protect themselves. In these situations, the experienced perceptions of law enforcement agents deserve deference and constitute a factor in our reasonable suspicion analysis." Winston, 444 F.3d at 119.

During the evidentiary hearing in this case, Nazario emphasized that the purpose of the security sweep was the safety of the officers at the scene. He was concerned about the presence of other subjects and additional weapons in the house. See Docket No. 76 at page 19. The evidence shows that from the vantage point of the small peep hole the officers broke through the glass on the door,[11] they could not determine whether there were more people there with Hernandez, and if so, where they may have taken off to. See Docket No. 76 at pages 98-99. In addition, the stairs to the second floor and the open door that led to the swimming pool and the garage were all adjacent to the dining room area where the arrest took place and to the kitchen counter where the weapon was laying.[12]

> As judges trained in the law, and not in
> apprehending suspects, we cannot determine in this
> situation how the agents could have gone about
> protecting themselves, but it does not seem
> logical or reasonable that given the circumstances
> … , the agents would leave such an obvious hiding
> place, from which harm could be dispensed,
> unsecured.

Winston, 444 F.3d at 120. Based on a reasonably perceived threat, the officers "swept" the residence to make sure no one else that could harm them was inside. Although the garage and the second floor were not accessible to Hernandez, who was confined to his wheel chair and swiftly placed under arrest, the court finds that the officers were justified

---

[11] See Government Exhibit 6.
[12] See Government Exhibit 8.

in performing a protective sweep in all other areas of the house where other individuals could be hiding.

In the context of the protective sweep, the Defendant argues that said doctrine does not allow officers to search in bags, drawers, boxes, or other small areas too small to harbor an individual. Accordingly, Hernandez contends that the evidence found in such spaces should be suppressed. In response, the government argues that the evidence found during the protective sweep was in plain view.

"[T]he plain view doctrine permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." United States v. Gamache, 792 F.3d 194, 199 (1st Cir. 2015) (citing United States v. Sanchez, 612 F.3d 1, 4-5 (1st Cir.2010); United States v. Jones, 187 F.3d 210, 219-221 (1st Cir.1999)). "In the 'plain view' context, this means that probable cause exists when the incriminating character of an object is immediately apparent to the police." Sanchez, 612 F.3d at 5 (citations omitted).

Upon the officers' entrance to the Defendant's residence, they almost immediately saw a Glock with a magazine on the kitchen counter, and cash ($721), four cellular phones and jewelry laying atop the dining table. We have already noted that guns and cellular phones are widely-known tools of the drug trade. In addition, where officers are executing an arrest warrant against a defendant involved in the illegal drug trade, a weapon's incriminating character is immediately apparent.

> It is now recognized by us and other circuits that firearms are one of the tools of the trade of drug dealers. Guns, like glassine bags, scales and cutting equipment are an expected and usual accessory of the narcotics trade. … Any reasonably competent police officer who discovered firearms while searching for drugs would be immediately aware of their evidentiary significance. We hold that the plain view exception to the warrant specificity requirement applies to the seizure of the firearms.

United States v. Caggiano, 899 F.2d 99, 103-04 (1st Cir. 1990) *abrogated on other grounds by* Horton v. California, 496 U.S. 128 (1990). See also

United States v. Gamble, 388 F.3d 74, 77 (2nd Cir.2004)(incriminating nature of ammunition immediately apparent because officers had probable cause to believe defendant was involved in drug dealing and guns and ammunition are frequently connected with such crimes). These items were unquestionably in plain view and thus, legally seized. See United States v. Paneto, 661 F.3d 709, 713 (1st Cir. 2011) ("A police officer, even though he does not have a search warrant, may seize an object in plain view as long as he has lawfully reached the vantage point from which he sees the object, has probable cause to support his seizure of that object, and has a right of access to the object itself.").

During the completion of the protective sweep in the second floor of the house, the agents found a bag with four kilograms of cocaine, four cellular phones on top of a bed, and $34,000 in cash in a box inside the master bedroom's closet. Except for the phones, determining whether the plain view doctrine applies to the seizure of these items is somewhat trickier.

At the evidentiary hearing, Nazario testified that the canine gave a positive alert to a dark-colored bag containing the bricks of cocaine, which were in "plain open." Docket No. 76 at pages 18-19; Government Exhibit 9. The picture depicting the bedroom where it was found was too dark to even see the bag on the floor at the foot of the bed.[13] See Docket No. 76 at page 76. In addition, the court notes that the sweep of the second floor took place between 5:45a.m. and 6:07a.m., when it was still dark outside, as argued by the government itself. See Docket No. 85 at pages 5-6. Therefore, the court finds it highly questionable that the cocaine bricks were "clearly visible" at that time of day.

Moreover, as previously mentioned, "the scope of a protective sweep must be limited to its purpose. The sweep 'may extend only to a cursory inspection of those spaces where a person may be found.'" Winston, 444 F.3d at 118 (citing Buie, 494 U.S. at 335). The bag in question cannot fit a person and its inspection was outside the scope of the protective sweep. See United States v. Soto-Peguero, No. CR 15-10182-RWZ, 2017 WL

---

[13] The photo of the bedroom shows the curtains were drawn and no lights were on. See Government Exhibit 9.

1946306, at *8 (D. Mass. May 9, 2017) ("[E]ven accepting the government's version of events as true, manipulating an object in a vent and opening a bag goes beyond the scope of a protective sweep. These are not locations where a person could be hiding."). Accordingly, the court finds that the evidence found in the bag is subject to suppression.[14]

The same holds true for the box containing cash in the master bedroom's closet. In its brief, the government argues that the cash was in an **"opened** shoe box located on the walking closet's floor … ." Docket No. 85 at page 6 (emphasis ours). In contrast, Nazario testified that "[t]he dog, when alerted, opened the box, and there was a lot of cash in that box." Docket No. 76 at page 19. The officers, canine or not, had no business opening a shoebox during the course of a protective sweep. Such search went beyond the purpose of finding persons that posed a threat to the agents on the scene. Accordingly, the court finds that the cash Honzo found in the box is also subject to suppression.

### B. Motor Vehicle Search

Hernandez also seeks to suppress the cocaine the officers found inside the cargo van that was parked in the garage of his residence and the firearm and cash found inside the minivan parked in the driveway. The Defendant argues that searching inside the cargo van was outside the scope of a protective sweep. In addition, the Defendant contends that the officers lacked the required probable cause to search inside the vehicles. See Docket No. 81 at pages 16-17. On the other hand, the government claims that the officers had an objectively reasonable belief that other individuals could be hiding inside the unlocked cargo van in the garage. After opening the rear doors, the government points out that the bales were in plain view. Finally, the government argues that the officers had probable cause to believe the vehicles contained evidence

---

[14] The court notes that upon the canine unit's positive alert of the bag containing cocaine, the law enforcement officers had probable cause to apply for a search warrant. After completing the protective sweep, the officers were in control of the perimeter and could have secured the scene during the application of and issuance of such a warrant.

of contraband, thereby triggering the automobile exception to the Fourth Amendment's warrant requirement.[15] <u>See</u> Docket No. 85.

"[T]he automobile exception provides that 'police officers may seize and search an automobile prior to obtaining a warrant where they have probable cause to believe that the automobile contains contraband.'" <u>United States v. Dion</u>, No. 16-1377, 2017 WL 2470405, at *12 (1st Cir. June 8, 2017) (<u>citing</u> <u>United States v. Silva</u>, 742 F.3d 1, 7 (1st Cir. 2014); <u>Florida v. White</u>, 526 U.S. 559, 563-64 (1999)). "The logic behind this automobile exception is that '[o]ne has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects.'" <u>United States v. Ramirez-Rivera</u>, 800 F.3d 1, 31 (1st Cir. 2015) (<u>citing</u> <u>South Dakota v. Opperman</u>, 428 U.S. 364, 368 (1976)). "[T]he [automobile] exception permits 'a probing search of compartments and containers within the automobile so long as the search is supported by probable cause.'" <u>United States v. Tanguay</u>, No. 16-CR-96-01-JD, 2017 WL 1512356, at *11 (D.N.H. Apr. 27, 2017) (<u>citing</u> <u>California v. Acevedo</u>, 500 U.S. 565, 570 (1991)). <u>See also</u> <u>United States v. Polanco</u>, 634 F.3d 39, 42 (1st Cir.2011) (holding that where there is probable cause to believe a vehicle contains evidence of criminal activity, agents can search without a warrant any area of the vehicle in which the evidence may be found).

"[P]robable cause only 'exists when the totality of the circumstances suggests that there is a fair probability that contraband

---

[15] The government also makes a passing reference to the inevitable discovery doctrine to justify and/or salvage the search and seizure of the incriminating evidence the officers found in the vehicles. <u>See</u> Docket No. 85 at pages 24-25. "The inevitable discovery doctrine 'allows for the admission of [otherwise excludable] evidence that would have been discovered even without the unconstitutional source.'" <u>United States v. Young</u>, 835 F.3d 13, 24 (1st Cir. 2016) (<u>citing</u> <u>Utah v. Strieff</u>, --- U.S. ----, 136 S.Ct. 2056, 2061 (2016)). Such evidence is nevertheless admissible "so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment." <u>United States v. Crespo-Rios</u>, 645 F.3d 37, 42 (1st Cir. 2011) (citations and quotation marks omitted). "The government bears the burden of showing the doctrine's applicability 'by reference to demonstrated historical facts and by a preponderance of the evidence.'" <u>United States v. Mayen-Munoz</u>, 844 F. Supp. 2d 251, 260 (D.R.I. 2012) (<u>citing</u> <u>United States v. Infante-Ruiz</u>, 13 F.3d 498, 503 (1st Cir.1994)). Because the government failed to meet its burden, the argument is deemed waived.

or evidence of a crime will be found in [the vehicle].'" <u>United States</u>
<u>v. Gonsalves</u>, No. 15-1194, 2017 WL 2456798, at *5 (1st Cir. June 7, 2017)
(<u>citing</u> <u>Ramirez-Rivera</u>, 800 F.3d at 27). "A police officer has probable
cause to conduct a search when the facts available to him would warrant
a person of reasonable caution in the belief that contraband or evidence
of a crime is present." <u>Florida v. Harris</u>, 568 U.S. 237, 243 (2013)
(citations and quotation marks omitted).

> The test for probable cause is not reducible to
> precise definition or quantification. … Rather,
> the standard is satisfied when the totality of the
> circumstances create a fair probability that …
> evidence of a crime will be found in a particular
> place. … All that is required is the kind of fair
> probability on which reasonable and prudent
> people, not legal technicians, act.

<u>United States v. White</u>, 804 F.3d 132, 136 (1st Cir. 2015)(internal
citations and quotation marks omitted), *cert. denied*, 136 S. Ct. 1229
(2016).

In the case at hand, the officers' knowledge of the charges against
Hernandez and the observations they made upon entry to the Defendant's
home would lead a cautious and prudent police officer to reasonably
believe that it was fairly probable that contraband or evidence of a
crime would be found in the vehicles. As previously stated, the law
enforcement agents found the Defendant in the company of unknown cohorts
that denied them entry by locking the door and then immediately fled
after the police broke the door.[16] In addition, tools of the drug trade,
such as a firearm, multiple cellular phones and cash, were in plain view.
Moreover, both cars had sand on them and the cargo van was dripping
water. When considering what the agents knew before the search of the
cars, it is worth mentioning that the investigation of the drug smuggling
operation that led to the issuance of Herndanez's arrest warrant was
called "Beach Break." Hence, the presence of salt water, sand and mud

---

[16] <u>See</u> <u>United States v. Hensel</u>, 509 F. Supp. 1376, 1387 (D. Me. 1981) ("[T]he totality
of these facts and circumstances, known to experienced agents familiar with the methods
employed by drug smugglers, established not only reasonable suspicion but more than
adequate probable cause to believe that [defendants] had been engaged in a drug smuggling
conspiracy and were fleeing the intended site of a [drug] unloading in order to avoid
being apprehended.").

on the premises and the cars is very much in line with the operation's elements. Finally, Nazario also testified that the hood of both the cargo van and the minivan were hot. "[T]he warmth of the engine showed that the [automobile] had been driven recently … ." Robinson v. Cook, 706 F.3d 25, 32 (1st Cir. 2013) (finding warmth of vehicle engine relevant circumstance in probable cause analysis to search car). "Given these facts, we think agents had more than enough probable cause to believe that [defendant's] car contained evidence of criminality." United States v. Polanco, 634 F.3d 39, 43 (1st Cir. 2011) (citing United States v. Woodbury, 511 F.3d 93, 97-98 (1st Cir.2007) (emphasizing that probable cause only requires a fair probability — which is well short of certainty — that evidence of criminal activity will be found in a particular place)).

Specifically in regards to the cargo van inside the garage, Hernandez claims that searching it within the scope of the protective sweep was unjustified because the officers did not see anyone running towards the van and there was no movement or noises coming from the inside of the van. However, the court has already concluded *supra* that the officers were justified in extending the protective sweep into the garage area, and the cargo van was definitely big enough to harbor several individuals. The fact that Nazario did not perceive any movements or noises coming therefrom is unpersuasive in light of the totality of the circumstances here. Common sense dictates that someone who is trying to hide is typically in a state of being still and quiet.

Hernandez also points out that the van was confined to the garage because the garage door was closed and blocked by another vehicle. However, the fact that the cargo van could not be driven anywhere at the time of the search is immaterial for the automobile exception to apply. "Even if a vehicle's mobility is temporarily restricted or potential drivers have been secured, warrantless vehicle searches supported by probable cause are generally valid." United States v. Vicente-Lucas, 826 F. Supp. 2d 422, 431 (D.P.R. 2011) (citing Pennsylvania v. Labron, 518 U.S. 938, 940 (1996)). "For purposes of the application of the automobile exception, the mobility requirement is satisfied whenever the vehicle to be searched is operational. … A functioning vehicle is considered to

be 'mobile' even if it already has been secured by the police." <u>United States v. Almeida</u>, No. 2:11-CR-127-DBH, 2012 WL 75751, at *8 (D. Me. Jan. 9, 2012)(quotation marks omitted) (<u>citing</u> <u>United States v. Garcia</u>, 433 Fed. Appx. 741, 744 (11th Cir.2011)), *aff'd*, 748 F.3d 41 (1st Cir. 2014). <u>See also</u> <u>United States v. Lisbon</u>, 835 F. Supp. 2d 1329, 1366 (N.D. Ga. 2011) ("The mobility requirement is satisfied whenever the vehicle to be searched is operational. … A functioning vehicle is considered to be 'mobile' even if it already has been secured by the police."), *aff'd sub nom.* <u>United States v. Moreno</u>, 559 F. App'x 940 (11th Cir. 2014); <u>U.S. v. Lindsay</u>, 482 F.3d 1285, 1293 (11th Cir. 2007)("The requirement of ready mobility is satisfied merely if the automobile is operational."). The hot hood and the fresh mud or sand on the tires and the bottom of the cars are general indicia that the van was operational, and thus, readily mobile.

Concerning the search of the Toyota Sienna minivan, the Defendant contends that exigent circumstances needed to exist to justify its search because the minivan was parked in the driveway of the house. Although the Defendant concedes that the applicability of the automobile exception to searches of a defendant's own vehicle parked in the defendant's own driveway is an issue that remains unresolved by the First Circuit, Hernandez claims to find grounds for its contention on the facts and holding of <u>Coolidge v. New Hampshire</u>, 403 U.S. 443 (1971). <u>See</u> Docket No. 81 at pages 19-20.

"In <u>Coolidge v. New Hampshire</u>, 403 U.S. 443, 91 S.Ct. 2045, 99 L.Ed.2d 564 (1971), a plurality refused to apply the automobile exception to an automobile that was seized while parked in the driveway of the suspect's house … ." <u>California v. Carney</u>, 471 U.S. 386, 403 (1985). Although the automobile exception allows for a warrantless search or seizure of a motor vehicle upon probable cause to believe that the vehicle contains contraband or other evidence of criminal activity, the <u>Coolidge</u> Court held that "where the vehicle is parked on private property, including in an individual's driveway, there also must be 'exigent circumstances' such that 'it is not practicable to secure a warrant [.]'" <u>Robinson v. Cook</u>, 863 F. Supp. 2d 49, 69 (D. Mass. 2012) (<u>citing</u> <u>Coolidge</u>, 403 U.S. at 460-62).

To that effect, the First Circuit Court of Appeals has expressed doubt as to whether a separate finding of exigency is required "[g]iven that the Supreme Court has repeatedly emphasized that the automobile exception does not have a separate exigency requirement … ." Robinson v. Cook, 706 F.3d 25, 31 (1st Cir. 2013)(citing Maryland v. Dyson, 527 U.S. 465, 467 (1999); Labron, 518 U.S. at 940). In Robinson, the First Circuit held that the police's seizure of defendant's car from his own driveway and without a warrant did not violate the Fourth Amendment. According to the court, "the police had probable cause to seize the car," Robinson, 706 F.3d at 32, and "[e]xigent circumstances — if actually necessary — were also present." Id. (emphasis ours). In reaching its conclusion, the First Circuit disregarded the defendant's argument that in addition to probable cause, the police also needed exigent circumstances to justify the seizure because the issue was neither disputed nor dispositive. See Robinson, 706 F.3d at 31-32. Nevertheless, the court noted that "the parties' understanding may stem from cases that predate the Supreme Court's clarification that the automobile exception has no exigency element." Robinson, 706 F.3d at 32 n. 4. Therefore, the First Circuit was "less certain" if a separate finding of exigency was required, id. at 31, particularly when "[m]ost circuits that have recently considered the propriety of warrantless vehicle searches or seizures on private property have found probable cause alone to be sufficient," id. at 32 n. 4.

The First Circuit's court uncertainty as to the application of the automobile exception in private property was also subsequently apparent in United States v. Ramirez-Rivera, 800 F.3d 1 (1st Cir. 2015), cert. denied, 136 S. Ct. 908, 193 L. Ed. 2d 800 (2016). In Ramirez-Rivera, an unknown informant tipped the police off that a dangerous fugitive was hiding out at defendant's house, stashing weapons and drugs. The police performed a warrantless search of defendant's house and car, found the fugitive, arrested him (and the several other people in the house, including defendant), and seized the drugs and guns they found. However, the First Circuit reversed the district court's denial of a motion to suppress and found that the informant's tip was not sufficiently reliable to provide probable cause for police officers' warrantless entry of

residence and search of defendant's vehicle in the carport. With regards to the search of the car, the First Circuit stated that "the so-called 'automobile exception' to the Fourth Amendment does nothing to save the search of [defendant's] car *(assuming the exception even applies to a car parked within the curtilage of a defendant's home, as was the case here)*." Id. at 30 (emphasis ours) (citing Coolidge, 403 U.S. at 460–62). The court then noted that the police still needed probable cause to believe that the automobile contained contraband before conducting a warrantless search, even "when the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home, such that warrantless examinations of automobiles have been upheld in circumstances in which a search of a home … would not." Ramirez-Rivera, 800 F.3d at 30-31 (quotation marks omitted).

Despite the foregoing, prior to both Ramirez-Rivera and Robinson, the First Circuit held in United States v. Goncalves, 642 F.3d 245 (1st Cir. 2011) that the district court did not err in denying defendant's motion to suppress evidence of drugs and gun obtained from a warrantless search of the car he drove, which was parked in a private driveway and unoccupied by anyone who might drive it away, because the police had probable cause to believe that the car contained drugs. The First Circuit Court recognized this was "a significant unresolved issue, primarily because, forty years ago, the Supreme Court held that the automobile exception did not justify the warrantless search of the defendant's car parked in his own driveway." Goncalves, 642 F.3d at 250 (citing Coolidge, 403 U.S. at 459-62). The court added that "[j]ust what to make of Coolidge's reach today is debatable," id., seeing as the Supreme Court had been lenient in upholding searches under the automobile exception in cases such as Pennsylvania v. Labron, 518 U.S. 938, 940 (1996), among others. See id.

In Pennsylvania v. Labron, 518 U.S. 938 (1996)(per curiam), the Court found that the warrantless search of defendant's truck did not violate the Fourth Amendment, even though it was parked on the driveway of a farmhouse, because police had probable cause to believe drugs would be found inside the vehicle. The Supreme Court in Labron reversed a state court ruling finding the search of a truck violated the Fourth Amendment

because although there was probable cause to search the vehicle, no exigent circumstances justified the failure to obtain a warrant. The Supreme Court stated that this conclusion "was incorrect," and that "[[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more." <u>Labron</u>, 518 U.S. at 940. The Court justified its holding in an automobile's ready mobility, as well as "the individual's reduced expectation of privacy in an automobile, owing to its pervasive regulation." <u>Id.</u>

"Based on the Supreme Court's ruling in <u>Labron</u>, it cannot be said that the Supreme Court has determined that a vehicle parked on residential property is never subject to the automobile warrant exception." <u>Kerr v. Jones</u>, No. 5:15CV6-WS/CAS, 2017 WL 1158249, at *8 (N.D. Fla. Feb. 28, 2017), *report and recommendation adopted*, No. 5:15CV6-WS/CAS, 2017 WL 1147473 (N.D. Fla. Mar. 27, 2017). Therefore, in light of the facts of this case and the relevant caselaw, the court finds that the search of the cars here was lawful.

Accordingly, the Defendant's request to suppress around 1,700 kilograms of cocaine found in the cargo van parked in the garage must be denied. As previously discussed, the police had probable cause to believe evidence of a crime would be found therein. In addition, exigent circumstances were present at the time of the search of the cargo van insofar as the officers had yet to finish the protective sweep when they opened the van and were in the middle of a hot pursuit of – at least – two fleeing men and potential associates of the Defendant. <u>See</u> <u>United States v. Block</u>, 483 F. Supp. 1296, 1300 (D. Mass. 1980)(finding sufficiently exigent circumstances existed to justify the opening of a camper without a warrant where it was reasonable for police officer to assume that fleeing man might have hidden inside it given officer was in "hot pursuit" and there was no time to obtain a warrant).

The court also denies the Defendant's request to suppress the evidence the officers found in the Toyota Sienna minivan parked in the driveway of the Defendant's home. This includes a pistol, cash, additional cellular phones and ID's. Despite the fact that it was parked

in the Defendant's driveway,[17] the search of the minivan was justified under the automobile exception to the warrant requirement because the officers had probable cause to believe that it contained contraband and that is all that is required to justify a warrantless search of a vehicle.

**C. Full Search of the House**

The Defendant complains that the officers conducted an unlawful warrantless full search of the house upon the authorization of the AUSA, who had no authority to do so. See Docket No. 81 at pages 17-19. According to the government, "the continued and extended scenario of exigent circumstances, strengthen [sic] probable cause, and substantial concern for the safety and protection of the agents and families in the neighborhood next to a main highway in a high crime area," Docket No 85 at page 8, justified the warrantless search.

"The exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant." Birchfield v. North Dakota, 136 S. Ct. 2160, 2173 (2016) (citing Michigan v. Tyler, 436 U.S. 499, 509 (1978).

> Relevant scenarios include (1) hot pursuit of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to herself.

Matalon v. Hynnes, 806 F.3d 627, 636 (1st Cir. 2015) (quotation marks omitted) (citing Hegarty v. Somerset County, 53 F.3d 1367, 1374 (1st Cir.1995)). "The government bears the burden of proving exigent circumstances." United States v. Samboy, 433 F.3d 154, 158 (1st Cir. 2005). "Proof of exigent circumstances should be supported by

---

[17] The court should point out that the Toyota Sienna minivan was parked in a driveway that was just feet away from the public street and in full view of all passersby. See Government Exhibit 5. To that effect, our sister courts have noted that when a vehicle is "apparently parked in an area without any 'indicia of privacy, such as an enclosure, barrier, or lack of visibility from the street,' the First Circuit has held there is no 'expectation of privacy in a driveway that is exposed to the public.'" Widi v. McNeil, No. 2:12-CV-00188-JAW, 2015 WL 8334962, at *5 (D. Me. Dec. 8, 2015) (citing United States v. Roccio, 981 F.2d 587, 591 (1st Cir. 1992)). "Indeed, '[i]f the relevant part of the driveway is freely exposed to public view, it does not fall within the curtilage.'" Widi, 2015 WL 8334962 at *5 (citing United States v. Brown, 510 F.3d 57, 65 (1st Cir. 2007)).

particularized, case-specific facts, not simply generalized suppositions about the behavior of a particular class of criminal suspects." <u>DeMayo v. Nugent</u>, 517 F.3d 11, 15 (1st Cir. 2008). "Officers are justified in relying on this exception only if they show an objectively reasonable basis for concluding that the loss or destruction of evidence is likely to occur." <u>Samboy</u>, 433 F.3d at 158.

It stems from the record that approximately twenty law enforcement agents, who arrived in about ten vehicles, were present at the scene at all times. After completing a protective sweep, the officers called AUSA Laborde and she instructed them to perform a full search of the house despite the absence of a search warrant. During such search, the officers additionally found a pistol magazine inside some tennis shoes at the entrance of the house[18]; a GPS; cash inside a man purse laying on the dining table; another cellular phone inside a second child's room; money in a night table and in the drawer of a cabinet in the master bedroom; and, a Beretta and a $100 bill in a safe box in the closet of the master bedroom. Nazario claimed that it took them approximately two hours to complete this search and that the officers were in control of the perimeter. Nazario never sought a search warrant or obtained Hernandez's consent for the search.

As previously held, exigent circumstances justified the officers' entry into the home and the completion of a protective sweep. During this first reasonable search, the officers found incriminating evidence and gathered sufficient observations to support the belief that evidence of a crime or additional contraband existed. But at the time the AUSA told the police officers they could conduct a warrantless search of the Defendant's home, the law enforcement agents had concluded the protective sweep and dispelled any suspicion that any individual who posed a threat to the officers' safety was hiding in the house. The perimeter was secure, and thus, no one could foreseeably destroy whatever incriminating evidence or contraband was not found during the protective sweep and remained inside the Defendant's residence. In fact, Nazario himself

---

[18] Nazario's assertion that this was in "plain view" is implausible where the officers had not seen the evidence in any of their visual inspections of the area during the course of the protective sweep.

testified that he performed this subsequent search because the AUSA "authorized" him to, not because any exigent circumstances persisted.

"[R]elying on what they had seen … to provide probable cause, the officers could have exited the home and obtained a warrant." United States v. Wright, 739 F.3d 1160, 1172 (8th Cir. 2014).

> The second time police officers entered, there was no justification for the warrantless search. … [Defendant's] home was 'secured,' meaning 'nobody could enter' or 'disturb anything.' Neither exigent circumstances nor public safety any longer justified a warrantless entry, … , and the officers — having assured themselves no one was inside — could not think there was any risk the marijuana might be destroyed … .

Wright, 739 F.3d at 1172 (citing Mincey v. Arizona, 437 U.S. 385, 392-93 (1978); King, 563 U.S. at 462).

Nazarios's reliance on the federal prosecutor's instructions was misplaced and the record is devoid of any evidence supporting a finding of exigent circumstances at the time of the second search. The risks the government claim existed were not so great as to allow a second warrantless entry and search. Under the facts of this case, no exigent circumstances justified a full warrantless search of the home following the completion of the protective sweep. Accordingly, the court grants the Defendant's request that any and all evidence found during this particular search be suppressed.

## IV. CONCLUSION

For the reasons set forth herein, the court hereby **GRANTS IN PART AND DENIES IN PART** the Defendant's motion to suppress (Docket No. 63, 81), and thus suppresses the following items found during the officers' search of Defendant's home:

a) Pistol magazine at entry of the house;

b) 4 kilograms of cocaine found in bag in male child's bedroom on the second floor;

c) Money found on male child's room on the second floor;

d) Money and receipts found on master room including some $45,940.00 in cash;

e) Beretta handgun found in walking closet at the master room; and,

f) Any and all other evidence seen or found for the first time during the full search of the house.

**IT SO ORDERED.**

In San Juan, Puerto Rico, June 30, 2017.

S/ <u>JUAN M. PÉREZ-GIMÉNEZ</u>
JUAN M. PÉREZ-GIMÉNEZ
UNITED STATES DISTRICT JUDGE